**Freddy TAVAREZ, Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**No. 84 Civ. 1691 (WCC).**

United States District Court, S.D. New York.

June 14, 1985.

Community Law Offices, New York City (Robert S. Herbst, New York City, of counsel), for plaintiff.

Rudolph W. Giuliani, U.S. Atty. for Southern Dist. of New York, New York

City (Mark S. Sochaczewsky, Sp. Asst. U.S. Atty., Annette H. Blum, Regional Atty., Region II, and Susan D. Baird, Sp. Asst. Regional Atty., Office of Gen. Counsel, Dept. of Health and Human Services, New York City, of counsel), for defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

Plaintiff Freddy Tavarez ("Tavarez") seeks an award of costs and attorney's fees from the Secretary of Health and Human Services ("the Secretary") for legal expenses incurred in his ultimately successful effort to secure Supplemental Security Income ("SSI") benefits. Tavarez relies on § 204(a) of the Equal Access to Justice Act ("EAJA" or "the Act"), 28 U.S.C. § 2412, which provides, *inter alia*, that in a suit brought against the United States, the court shall award costs and reasonable attorney's fees to a private prevailing party unless "the position of the United States was substantially justified or ... special circumstances make an award unjust." *Id.* § 2412(d)(1)(A).

The Government does not deny that Tavarez is a prevailing party as that term has been construed, but it contends that he is not entitled to attorney's fees because the Secretary's position in the litigation was substantially justified. The Government also objects to the large amount sought here—$24,149.00 in attorney's fees and $4,359.85 in costs.

*Background*

Before addressing the merits of this motion, it is necessary to review the history of this case in order to put the pertinent issues in context. Tavarez first filed for SSI benefits on May 24, 1982. The Secretary denied that application on October 14, 1982. Two weeks later, Tavarez requested that the Secretary reconsider her decision, but his claim was again denied on March 3, 1983. On March 11, 1983, Tavarez requested a hearing to review the Secretary's deci-

sion, and on June 16, 1983, such a hearing was held before an administrative law judge ("ALJ").

The ALJ heard testimony from Tavarez and received into evidence various medical records and reports. On July 19, 1983, he issued a decision. He found that "[t]he medical evidence establishes that the claimant has Hansen's disease," more commonly known as leprosy, "but he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4." (Tr. at 16).[1] The ALJ also found that Tavarez had the residual functional capacity to perform work that does not involve heavy lifting and carrying or extended walking or standing. (*Id.*) He found that Tavarez's past work as a sewing machine operator did not involve those activities and concluded that Tavarez was therefore not "disabled" as defined in the Social Security Act. (*Id.*) The Appeals Council approved the ALJ's decision on January 10, 1984, thereby making it the final decision of the Secretary.

On March 9, 1984, Tavarez commenced an action in this Court pursuant to 42 U.S.C. § 1383(c)(3) to obtain review of the Secretary's determination. After receiving two sixty-day extensions from Tavarez, the Secretary finally filed her answer on September 17, 1984. She denied that Tavarez was entitled to benefits, and stated that her decision was correct and in accordance with applicable law and regulations. Def't Answer at ¶ 4. On October 18, 1984, Tavarez notified the Secretary that he would soon move for judgment on the pleadings pursuant to Rule 12(c), F.R.Civ.P. On November 13, 1984, Tavarez filed his motion papers and a supporting memorandum of law. The Secretary requested an extension of time to respond to the motion, which the Court granted.

On December 14, 1984, the Secretary informed Tavarez that the Appeals Council had agreed on that day to grant him SSI

---

**1.** The abbreviation "Tr." refers to the page number in the administrative record filed as part of

the Government's answer.

benefits and to pay him back benefits from the original date of his application. Accordingly, it became unnecessary for the Government to respond to the motion; instead, counsel for the parties executed a stipulation of remand on December 20, 1984, which the Court endorsed on January 2, 1985.

### Discussion

The court of appeals has established clear rules for reviewing fee applications under the EAJA. It has held that in determining whether the Government's "position" was substantially justified, a court should examine only the Government's position in litigation and not its actions during the underlying administrative proceedings. *Dubose v. Pierce*, 761 F.2d 913, 917 (2d Cir. 1985); *Boudin v. Thomas*, 732 F.2d 1107, 1115–16 (2d Cir.1984). Obviously, in cases such as this one, where litigation is commenced to review an administrative action, the Government's position in the litigation is often the same as in the administrative proceedings. Nonetheless, the focus of the inquiry should be on the Government's litigation posture.

■ The test of whether the Government's position was substantially justified is essentially one of reasonableness. *Dubose*, at 918. The Government bears the burden of demonstrating the justification for its position, *id.*, and it must make a strong showing to meet that burden. *Environmental Defense Fund, Inc. v. Watt*, 722 F.2d 1081, 1085 (2d Cir.1983). However, the Government cannot automatically convert an unjustified position into a substantially justified one simply by settling the lawsuit. *Id.* Instead, the court must assess the Government's position in the full course of the litigation. *Id.*

■ The Secretary's position for most of this litigation was the one pleaded in her answer—that her decision was correct and in accordance with the applicable law and regulations. I trust that before filing its answer, the Government reviewed the ad-

ministrative record to make certain that the Secretary's determination was indeed in accordance with the applicable law. The Government certainly had ample opportunity to conduct such a review—it waited almost six months to file its answer. After a review of the record, it should have been apparent to the Government that the Secretary's decision was unsupportable because the ALJ had clearly applied the wrong standard and had acted contrary to substantial evidence in deciding that Tavarez was not disabled.

Regulations promulgated by the Secretary provide categorical definitions for some disabilities. Under 20 C.F.R. § 416.-920(d), an individual is by definition disabled if he has an impairment that meets the duration requirement and that is listed in Appendix 1 to Subpart P. Section 10.02 of Appendix 1 lists as an impairment: *"Hansen's disease (leprosy).* As active disease or consider as 'under a disability' while hospitalized."

The ALJ concluded that Tavarez's condition did not meet the standard of § 10.02 even though he conceded that Tavarez had Hansen's disease. He indicated that he rejected Tavarez's claim because "[a]ll evidence indicates that claimant's condition is controlled with medication and he has not been rehospitalized since 1979." (Tr. at 16.) However, the relevant issue with respect to § 10.02 is not whether the disease is "controlled," but whether it is "active." The regulation makes no suggestion whatsoever that the capacity of medication to control an active case is an appropriate consideration. Thus, the ALJ clearly applied the wrong standard in determining that Tavarez's condition was not a listed Appendix 1 impairment.

Moreover, the ALJ completely ignored specific evidence that Tavarez's condition was indeed active. Dr. William R. Levis, Director of Hansen's Disease at Bayley Seton Hospital on Staten Island, was Tavarez's treating physician. In response to a questionnaire, Dr. Levis stated that Tava-

rez had an "active" case of Hansen's disease:

Q. 1. Does Mr. Tavarez currently have an active case of Hansen's disease?

A. 1. Yes.

\* \* \* \* \* \*

Q. 1.b. Can it ever be completely cured?

A. 1.b. Activity can be controlled, but residual loss of sensation will persist.

(Tr. at 188). In these answers, Dr. Levis clearly distinguished between the terms "active" and "controlled," and did not suggest that Tavarez's case was not active merely because it could be controlled. Dr. Levis's conclusion that Tavarez's condition was active was also supported by laboratory reports. In referring to these reports in his answers to the questionnaire, Dr. Levis stated: "A.11. 'B1 + 3' Bacillus Index of 3+ indicates a significant number of micro bacterium lepra are in the tissue. *This indicates that [the] patient has reactivated.*" (Tr. at 191; emphasis added).

Dr. Levis's opinion that Tavarez had active Hansen's disease was not controverted by any other medical expert. Indeed, none of the other physicians who examined Tavarez in connection with his claim addressed the status of his Hansen's disease or performed any laboratory tests relating to the disease. It is settled law that in the absence of substantial contradictory evidence, the opinion of the claimant's treating physician is binding on the Secretary. *Donato v. Secretary of HHS*, 721 F.2d 414, 419 (2d Cir.1983); *Hankerson v. Harris*, 636 F.2d 893, 896 (2d Cir.1980). Thus, since the ALJ's finding that Tavarez was not disabled necessarily implies that the disease was not active, the ALJ acted contrary to substantial evidence.

For all of these reasons, the Government should have realized that the Secretary's decision was not correct and not in accordance with the applicable law. Perhaps the Government could be excused if these issues had been buried deep within the administrative record, but they were not. Indeed, on page five of the administrative record begins a seven-page brief from Ta-

varez's previous attorney to the Appeals Council urging that it reverse the ALJ's decision. Counsel raised all of the issues I have discussed and more, and cited the relevant case law. Therefore, the Government was put on early notice that there were serious questions as to the propriety of the Secretary's decision. Before filing its answer, the Government should have taken the opportunity to assess these issues; I am confident that if it had, it would have immediately remanded the case for further consideration.

■ The Government nonetheless argues that its litigation position was substantially justified because eventually it did voluntarily remand the case to the Secretary. The Government contends that this case is analogous to *Operating Engineers Local Union No. 3 v. Bohn*, 541 F.Supp. 486 (D.Utah 1982), *aff'd*, 737 F.2d 860 (10th Cir.1984), where the court refused to award EAJA fees because the Government conceded that plaintiff had been wronged.

However, there is a critical difference between that case and this one. In *Bohn*, the Government capitulated nine days after the plaintiff filed its complaint, and thus plaintiff was required to expend little effort in litigating its claim. In this action on the other hand, the Government did not agree to a voluntary remand until six months had elapsed and Tavarez had prepared and filed his motion for judgment on the pleadings. While the Government is to be commended for the voluntary remand, the fact remains that it should have remanded the case immediately upon a review of the administrative record. For the reasons I have discussed, I can only conclude that the Government's litigation position was not substantially justified. Accordingly, Tavarez is entitled to his costs and reasonable attorney's fees.

■ As mentioned earlier, Tavarez seeks $24,149.00 in attorney's fees. His *pro bono* counsel, Robert Herbst, has averred that he and four other attorneys working with him put in a total of 294.5 hours on this case. Herbst Decl. at Appendix A;

Herbst Supp. Decl. at ¶ 2. Herbst requests compensation for his services and his colleagues' services at $82.00 per hour. He bases that figure on the $75.00 per hour maximum rate authorized by the EAJA plus a $7.00 per hour cost of living increase. *See* 28 U.S.C. § 2412(d)(2)(A).

While I do not doubt the veracity of Herbst's claim that he and the other attorneys working on this case actually spent 294.5 hours on it, I cannot conclude that it was reasonable to do so. As can be seen from the discussion above, this case was not difficult and the issues presented were not complex. Moreover, I cannot understand why so many hours were spent researching the legal issues in this case since, as I have mentioned, Tavarez's previous attorney had already prepared a fine brief on them. Even if this prior brief had not been written, an experienced attorney should have been able to litigate this case effectively, up to the point of settlement, with an expenditure of no more than approximately one-third the number of hours claimed.

The Government has raised additional objections to the fee application as well. I have carefully considered those objections and conclude that Herbst and his associates should have spent no more than 100 hours in litigating both the merits of the case and this fee application.

As noted, Herbst requests compensation at the statutory maximum rate of $75.00 per hour plus a $7.00 per hour cost of living increase. Herbst and his colleagues are associates at a major New York law firm and their services are usually billed at a rate substantially higher than $75.00 per hour. Herbst Decl. at ¶¶ 3–7. In addition, they have worked on numerous *pro bono* matters while serving of counsel to the Volunteer Division of the Legal Aid Society's Community Law Offices. *Id.* Accordingly, I find that their experience and credentials warrant awarding the maximum statutory rate.

Herbst also seeks an additional $7.00 per hour cost of living increase. While the EAJA permits a court to adjust upward the $75.00 per hour maximum rate, I decline to do so here because no basis has been offered for the cost of living increase. If there was a rational basis for the $7.00 per hour figure, it should have been included in Herbst's affidavit. Therefore, for all of the reasons above, I award Tavarez fees for 100 hours of work at $75.00 per hour, for a total of $7,500.00.[2]

Tavarez also seeks costs in the amount of $4,359.95 for such items as the expense of three research assistants, word processing costs, and photocopying costs. The EAJA directs that costs should be awarded as enumerated in 28 U.S.C. § 1920. 28 U.S.C. § 2412(a).

I have reviewed the costs requested and conclude that most are unrecoverable. I decline to award costs for the three research assistants, even though I ordinarily encourage the use of paralegals whenever possible. In this case there was a limited amount of work to be done, and in light of the extraordinary number of hours Herbst and his colleagues spent on the case, I cannot see why the additional services of research assistants were necessary. I also decline to award the expenses of word processing since they are not recoverable under § 1920. *United States v. Bedford,* 548 F.Supp. 748, 753 (S.D.N.Y. 1982). Finally, photocopying expenses are recoverable under § 1920 only to the extent that the copies were furnished to the Court or to opposing counsel. *Beech Cinema, Inc. v. Twentieth Century-Fox Film Corp.,* 480 F.Supp. 1195, 1198 (S.D.N.Y. 1979), *aff'd,* 622 F.2d 1106 (2d Cir.1980). Therefore, I have limited the award of costs to $50.00.

---

**2.** This Court relies heavily on attorneys who provide *pro bono* representation to indigent plaintiffs with meritorious claims. The reduction of the fees requested should in no respect be deemed a disparagement of counsel's able and dedicated service, nor a discouragement of others who volunteer their assistance to deserving litigants who could not otherwise afford them.

## Conclusion

Plaintiff's motion for costs and attorney's fees is granted. The United States is directed to pay plaintiff $50.00 in costs and $7,500.00 in attorney's fees.

SO ORDERED.